



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

Musafiri G. KABENGA,

        Petitioner

v.

Eric H. HOLDER, Jr., Attorney General of the United
States; U.S. DEPARTMENT OF JUSTICE;
R. Gil KERLIKOWSKE, Commissioner of U.S.
Customs and Border Protection; James T. MADDEN,
New York Field Office Director, U.S. Customs and
Border Protection; U.S. CUSTOMS AND BORDER
PROTECTION; Jeh JOHNSON, Secretary of
Homeland Security; U.S. DEPARTMENT OF
HOMELAND SECURITY,

        Respondents

------------------------------------------------------------

Case No. _____
Immigration File No. A028-510-715

**EMERGENCY MOTION FOR
STAY OF REMOVAL**

## PRELIMINARY STATEMENT

Petitioner Musafiri G. Kabenga ("Petitioner" or "Mr. Kabenga") hereby moves this Court for an order staying his removal to the Democratic Republic of Congo ("DRC") pending this Court's adjudication of his contemporaneously filed Petition for a Writ of Habeas Corpus. Petitioner further requests that this Court order a temporary stay pending its adjudication of this motion. Petitioner is detained in the custody of the U.S. Department of Homeland Security ("DHS") and has a final order of removal. On information and belief, his removal from the United States is imminent. *See* Declaration of Amy V. Meselson, dated November 13, 2014 ("Meselson Decl.").

An application for a stay of removal is governed by a four factor test in which courts consider: (1) whether the applicant has shown a likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

1

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009).[1] "The first two factors are most critical." *Id.* All of these factors strongly support the issuance of a stay of removal in this case.

1. Success on the Merits

In order to demonstrate a likelihood of success on the merits, the chance of success must be "better than negligible," and more than a "mere possibility of relief." *Id.* (internal quotations and citations omitted). The petitioner does not have to show that he will "more likely than not" succeed, but only that he has a "substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 966–68 (9th Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010)). Further, the likelihood of success that must be demonstrated is inversely proportional to the amount of irreparable injury the applicant must show he will suffer absent the stay. *See Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006).

Mr. Kabenga's habeas petition seeks review of the order of removal entered against him by U.S. Customs and Border Protection on July 28, 2014, and affirmed by the New York Immigration Court on November 10, 2014. This Court has jurisdiction to review that order pursuant to 8 U.S.C. § 1252(e)(2)(C). Mr. Kabenga's challenge to his removal order is based on the claim that he is a lawful permanent resident of the United States. For the reasons set forth in Mr. Kabenga's habeas petition, he has a "substantial case for relief on the merits." *Leiva-Perez v.*

---

[1] The Supreme Court in *Nken* held that courts must consider these "traditional stay factors," notwithstanding the statutory provision stating that a court may not "enjoin" the removal of an alien subject to a final removal order, "unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 556 U.S. at 425-6 (quoting 8 U.S.C. § 1252(f)(2)).

2

*Holder*, 640 F.3d 962, 966–68 (9th Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010)).

In the event that the Court finds that Mr. Kabenga has not demonstrated a sufficient likelihood of success on the merits, Petitioner requests that the Court enter a temporary stay, pending final adjudication of the instant stay motion, to enable him to submit further briefing and obtain additional documents in support of his claim. As stated in the Declaration of Amy V. Meselson, dated November 12, 2014, counsel for Petitioner has requested, but not yet received, the complete records of Petitioner's 2012 removal proceedings.

2. Irreparable Harm

Petitioner faces a high likelihood of irreparable harm if he is removed to the DRC before his habeas petition is adjudicated by this Court. If the Court grants that petition, it is extremely uncertain whether he would be able to return to the United States. The Court should not rely on the Supreme Court's statement in *Nken* that the harm of deportation is not "categorically irreparable." In making this statement, the Supreme Court cited and relied on an assurance by the Solicitor General, later qualified, that individuals "who prevail can be afforded effective relief by facilitation of their return along with restoration of the immigration status they had upon removal." *Nken*, 556 U.S. at 435 (citing Brief for Respondent at 44). The Supreme Court understandably reasoned from this assurance that any wrongful removal could be and would be properly redressed.

Subsequent developments demonstrate that the Supreme Court was misled by the Solicitor General's representation. On February 7, 2012 and February 24, 2012, U.S. District Court Judge Jed S. Rakoff ordered the release of the email communications that formed the basis for this statement. *See Nat'l Imm. Project v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720,

722 (S.D.N.Y. 2012). These emails evidenced an informal, incomplete and inconsistent procedure for facilitating return of only some individuals, a far cry from a "policy and practice" of returning all individuals who prevail in challenges to their removal orders.

With the release of the emails, the Office of the Solicitor General ("OSG") submitted to the Supreme Court a six-page letter dated April 24, 2012 with attachments "in order to clarify and correct" the misleading statement in its *Nken* brief. *See* OSG Letter at 1 (Ex. G).[2] Despite the OSG's admissions that the return policy was not the "formal and structured process" presented to the Supreme Court, the OSG informed the Court that it need not take any action in view of a new "policy" regarding returns. *See id.*, app'x B (Ex. G). The OSG's letter asserted that "[i]n stay litigation going forward, where the government contends that removal alone does not constitute irreparable harm, it will submit to the lower courts the procedures to facilitate return described above." *Id.* at 5.

The new policy referred to in the OSG's letter is set forth in a 2012 policy memo issued by Immigration and Customs Enforcement ("ICE"), "Facilitating the Return to the United States of Certain Lawfully Removed Aliens" ("ICE Memo"). The ICE Memo states, in part:

> Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings.

ICE Memo at 1 (Ex. H).

This policy is severely inadequate to avoid irreparable harm resulting from deportation. First, ICE has stated that it does not intend this policy to bind agency employees or carry the force of law. The directive explicitly states that it "does not apply to bargaining unit employees"

---

[2] All exhibits are attached to the Declaration of Amy V. Meselson, dated November 13, 2014, filed contemporaneously with this motion.

4

and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* at 5. Further, by issuing a mere statement of policy, ICE may change its position on returns at any time.

In addition, ICE's policy clearly states that it will not allow the return of an individual solely because his challenge to his removal order is granted, but instead will only help to return those who are restored to lawful permanent resident status or whose "presence is necessary for continued administrative removal proceedings." *Id.* at 1. ICE provides no guidance as to the circumstances under which an individual's presence would be deemed "necessary." Further, ICE's 2012 policy explicitly states that the government is not required to pay for the deportee's return or make travel arrangements. *Id.* at 1-2 ("Facilitating an alien's return does not necessarily include funding the alien's travel via commercial carrier to the United States or making flight arrangements for the alien."). Thus, the government's return policy will be completely ineffective for those who cannot afford to pay for international travel.

The inability of a respondent to be physically present at remanded removal proceedings would seriously undermine the fairness of those proceedings. There is no reason to believe that ICE would help facilitate or pay for communication by telephone or videoconference from wherever the deportee is. Even if such communication were possible, there is no guarantee that it would be technologically sufficient to enable a meaningful appearance before the court. Indeed, it is unlikely that it would be for those who have been deported to impoverished, undeveloped, or unstable areas, such as the DRC.[3]

---

[3] According to a recent World Bank report, the DRC is "a fragile country with tremendous needs in terms of reconstruction and economic growth, and weak institutions. The security situation remains tense, particularly in the eastern provinces. Peacebuilding and economic recovery efforts are being carried out in a challenging social context. The country's infrastructure, already hobbled by a lack of maintenance, has also been badly damaged by the conflicts. . . . Despite an

5

Moreover, it would be extremely time-consuming and expensive, if not impossible, for Mr. Kabenga, who was unable to find employment when he lived in the DRC from 2013 to 2012 and has no financial resources, to obtain necessary evidence, such as affidavits, employment records, medical records, educational records, Social Security and tax records, country conditions reports, and other evidence that is routinely presented in removal proceedings. Attempting to proceed from abroad would also create serious obstacles to retaining and communicating with counsel. Because Mr. Kabenga cannot afford to pay for counsel, it is highly unlikely that any legal representation would be available at all. It would also be extremely difficult for noncitizens proceeding from abroad to timely review and respond to evidence presented by the government. All of these difficulties inherent in participating in removal proceedings from abroad, which are especially acute in Mr. Kabenga's case given the condition of the DRC and his lack of financial resources, would likely make a fair hearing impossible.

Indeed, newly released documents in another case reveal that ICE refuses to pay for return travel even when it is clear that the noncitizen cannot pay for it himself. *See* Decl. of Nancy Morawetz (Ex. J).[4] These documents show that it took more than *six years* after a removal order was vacated for a petitioner to be returned to the United States, and the return only happened when the government faced the prospect of answering the Ninth Circuit Court of Appeals' direct questions about whether the Immigration Court and Board of Immigration

---

impressive economic growth rate, the DRC's poverty rate remains high, even though it fell from 71% in 2005 to 63% in 2012. The DRC ranks second to last on the Human Development Index (186 out of 187 countries), and its per capita income, which stood at US$220 in 2012, is among the lowest in the world. . . . A humanitarian emergency persists in the more unstable parts of the DRC . . . ." World Bank, *Democratic Republic of Congo Overview* (Ex. I).

[4] The Morawetz Declaration includes a number of exhibits, which are not included in Petitioner's submission due to their length. Counsel will provide the exhibits to the Court upon request. In addition, they are available at:
http://www.nationalimmigrationproject.org/legalresources/NIPNLG_v_DHS/Declaration%20of%20Nancy%20Morawetz%20and%20Exhibits%20in%20Support.pdf

Appeals have jurisdiction over reopened and remanded removal proceedings where the respondent is abroad. *See id.* at ¶ 11.

In sum, it is very likely that removal of Mr. Kabenga to the DRC would make any relief ordered by this Court completely ineffective for an indefinite period of time, if not permanently.

### 3. Injury to Government and Harm to Public Interest

The Court in *Nken* found that the last two stay factors, injury to other parties in the litigation and the public interest, merge in immigration cases because the government is both the opposing litigant and public interest representative. *Nken*, 556 U.S. at 435. The *Nken* Court recognized that the "public interest in preventing aliens from being wrongfully removed" must weigh heavily in the Court's consideration. *Id.* In addition, the public has an interest in the Court "ensur[ing] that whatever compassionate conditions are written into law are carefully adhered to, no matter how slim the alien's chances to escape deportation may be." *Rosario v. INS*, 962 F.2d. 220, 221 (2d Cir. 1992) (superseded by statute on other grounds); see also *Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) (holding under pre-*Nken* standard that the public interest in the correct and evenhanded application of immigration laws weighed in favor of granting stay of removal).

## CONCLUSION

For these reasons, Petitioner respectfully requests that the Court grant this motion for a stay of removal pending the adjudication of his habeas petition, and grant a temporary stay pending adjudication of this motion.

Dated: November 13, 2014

Respectfully,

THE LEGAL AID SOCIETY
Scott A. Rosenberg, General Counsel
Adriene Holder, Attorney-in-Charge, Civil Practice
Jojo Annobil, Attorney-in-Charge, Immigration Law Unit
Rex Chen, Supervising Attorney, Immigration Law Unit
Amy Meselson, Of Counsel
199 Water Street
New York, NY 10038

By:

*/s/ Amy V. Meselson*
Amy V. Meselson
The Legal Aid Society
199 Water Street, 3rd Floor
New York, NY 10038
Tel: 212-577-3347
Fax: 646-616-4581
E-mail: AVMeselson@legal-aid.org

ATTORNEY FOR PETITIONER